UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 99-2496 (PLF) |
| PHILIP MORRIS USA INC. et al., | ) ) | |
| Defendants. | ) ) ) | |

## OPINION

The Public Health Intervenors ("Intervenors") have filed a Motion to Clarify and Amend Order #1015 ("Mot.") [Dkt. No. 6445]. Intervenors ask the Court to clarify that defendant Philip Morris USA, Inc. ("Philip Morris") and its parent Altria Group, Inc. ("Altria" and collectively with Philip Morris, "defendants") are required under Order #1015 – Final Judgment and Remedial Order ("Order #1015") [Dkt. No. 5733] to add to Philip Morris's Internet Document Website all discovery materials that have been or will be produced by defendants in a separate proceeding, In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation ("In re JUUL Labs"), MDL No. 19-2913 (N.D. Cal.) (the "JUUL MDL"). See Mot. at 1-2. In the alternative, Intervenors ask the Court to amend Order #1015 to require defendants to add these documents to the Internet Document Website. See id.

Intervenors also request that the Court modify Order #1015 pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure to require defendants to maintain Philip Morris's Internet Document Website beyond its September 1, 2021 expiration date. See id. On August 19, 2021, the Intervenors filed an emergency motion, asking the Court to order the

defendants to maintain the Internet Document Website while the motion to modify Order #1015 is pending. See Public Health Intervenors' Emergency Motion to Require PM and Altria to Maintain Their Document Website Until the Court Rules on the Intervenors' Motion to Clarify and Amend Order #1015 ("Intervenors' Emergency Mot.") [Dkt. No. 6446]. The defendants did not oppose this request. See Defendants' Notice of Non-Opposition to Public Health Intervenors' Emergency Motion ("Defendants' Notice of Non-Opposition") [Dkt. No. 6448]. On August 25, 2021, the Court granted the Intervenors' emergency motion and ordered the defendants to maintain the Internet Document Website until the resolution of the motion to clarify. See Order #112 – Remand [Dkt. No. 6449].

The Court heard oral argument on the Intervenors' motion on July 20, 2022. Upon careful consideration of the parties' oral and written arguments, the relevant legal authorities, and the entire record in this case, the Court will grant Intervenors' motion to clarify, having concluded that defendants are required under Order #1015 to publish the discovery materials produced in the JUUL MDL on Philip Morris's Internet Document Website.[1]

---

[1] The documents and the attachments thereto that the Court has considered with the pending motion include: Order #1015 – Final Judgment and Remedial Order ("Order #1015") [Dkt. No. 5733]; Order #1021 ("Order #1021") [Dkt. No. 5765]; Public Health Intervenors' Motion to Clarify and Amend Order #1015 ("Mot.") [Dkt. No. 6445]; Public Health Intervenors' Brief in Support of Their Motion to Clarify and Amend Order #1015 ("Intervenors' Br.") [Dkt. No. 6445-1]; Opposition to Public Health Intervenors' Motion to Clarify and Amend Order #1015 ("Def. Opp.") [Dkt. No. 6450]; Public Health Intervenors' Reply Brief in Support of Their Motion to Clarify and Amend Order #1015 ("Intervenors' Reply") [Dkt. No. 6452]; Public Health Intervenors' Supplemental Brief in Support of Their Motion to Clarify and Amend Order #1015 ("Intervenors' Suppl.") [Dkt. No. 6505]; Supplemental Brief of Altria Group, Inc. and Philip Morris USA Inc. ("Def. Suppl.") [Dkt. No. 6506]; Joint Stipulation of Altria Group, Inc., Philip Morris USA Inc., and Public Health Intervenors Regarding Juul Settlement ("Joint Stip.") [Dkt. No. 6517]; Public Health Intervenors' Emergency Motion to Require PM and Altria to Maintain Their Document Website Until the Court Rules on the Intervenors' Motion to Clarify and Amend Order #1015 ("Intervenors' Emergency Mot.") [Dkt. No. 6446]; Defendants' Notice of Non-Opposition to Public Health Intervenors' Emergency Motion ("Defendants' Notice of Non-Opposition") [Dkt. No. 6448]; and Order #112 – Remand [Dkt. No. 6449].

## I. BACKGROUND

### A. Defendants' Transparency Obligations

Prior opinions summarize the detailed factual and procedural history in this case. See United States v. Philip Morris USA Inc., 436 F. Supp. 3d 1, 3-4 (D.D.C. 2019); United States v. Philip Morris USA Inc., 566 F.3d 1095, 1105-1110 (D.C. Cir. 2009) (per curiam); see generally United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1 (D.D.C. 2006).[2]

In brief, the United States brought this civil action in 1999 against defendants, among other cigarette manufacturers and two tobacco-related trade organizations, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. After substantial pretrial proceedings and discovery and a nine-month bench trial, Judge Kessler found in 2006 that defendants had violated RICO "by engaging in a lengthy, unlawful conspiracy to deceive the American public about the health effects of smoking and environmental tobacco smoke, the addictiveness of nicotine, the health benefits from low tar, 'light' cigarettes, and their manipulation of the design and composition of cigarettes in order to sustain nicotine addiction." United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 26-27. Judge Kessler also concluded that, "as long as Defendants [we]re in the business of selling and marketing tobacco products," there was a "reasonable likelihood" that they would violate RICO again, warranting injunctive relief. Id. at 909, 911. The Court issued an injunctive remedial order, Order #1015, to "prevent and restrain" defendants' future unlawful conduct. See Order #1015; United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 923-37.

---

[2]    Judge Gladys Kessler presided over this case until her retirement, at which time the case was reassigned to the undersigned.

Among its many obligations under Order #1015, Philip Morris was required to maintain an "Internet Document Website" (www.pmdocs.com) until September 1, 2021, at its expense. See Order #1015 ¶ III.C.8; Order #1021.[3] Philip Morris was also required to upload onto the Internet Document Website "all documents produced on or after [August 17, 2006,] in any court or administrative action in the United States concerning smoking and health, marketing, addiction, low-tar or low-nicotine cigarettes, or less hazardous cigarette research" as well as "all transcripts of depositions and letter of request testimony . . . given by any of [Philip Morris's or Altria's] current or former employees, officers, directors, corporate designees, attorneys or agents" in any such action. Order #1015 ¶ III.C.10.a (emphasis added); see id. (requiring Philip Morris to "provide on its website all such documents produced by, pertaining to, or concerning Altria").

In ordering these transparency obligations, Judge Kessler observed that defendants' "suppression and concealment of information [was] integral to the [RICO] Enterprise's overarching scheme to defraud" the American public. United States v. Philip Morris, 449 F. Supp. 2d at 928. Requiring defendants to publish "all industry documents disclosed in litigation" would "allow the public to monitor what Defendants are doing internally and to assess the accuracy of future information they may make available about their activities and their products." Id. Furthermore, "[i]mposing such disclosure requirements [would] act as a powerful restraint on Defendants' future fraudulent conduct." Id. at 928-29.

---

[3] On August 25, 2021, this Court ordered defendants to maintain the Internet Document Website in its current form pending the Court's ruling on Intervenors' motion to clarify. See Order #112 – Remand; Intervenors' Emergency Mot.; and Defendants' Notice of Non-Opposition.

## B. *The Juul MDL*

In recent years, states and individual plaintiffs have filed thousands of lawsuits in both state and federal court against JUUL Labs, Inc. ("JLI") concerning its marketing practices and alleged misrepresentations about JUUL products' health effects.[4] On October 2, 2019, the United States Judicial Panel on Multidistrict Litigation ("MDL Panel") granted common defendant JLI's motion to centralize federal litigation involving "allegations that JLI has marketed its JUUL nicotine delivery products in a manner designed to attract minors, that JLI's marketing misrepresents or omits that JUUL products are more potent and addictive than cigarettes, that JUUL products are defective and unreasonably dangerous due to their attractiveness to minors, and that JLI promotes nicotine addiction." Transfer Order, In re Juul Labs, MDL No. 19-2913 (N.D. Cal. Oct. 2, 2019) [Dkt. No. 1] at 1. The MDL Panel selected the Northern District of California as the transferee district and assigned the litigation to Judge William H. Orrick III. See id. at 2.

---

[4]    JUUL Labs, Inc. has settled thousands of lawsuits within the past few years, paying out more than $1 billion total to individual plaintiffs and forty-eight states. See Juul Labs, Statement by JUUL Labs on Settlement with Minnesota Attorney General (Apr. 17, 2023), https://www.juullabs.com/statement-by-juul-labs-on-settlement-with-minnesota-attorney-general/ <https://perma.cc/U8NY-MQT5> (describing "global resolution of the U.S. private litigation that covers more than 5,000 cases brought by approximately 10,000 plaintiffs"); see also Jen Christensen, Juul to pay $438.5 million in settlement with dozens of states over marketing to underage people, CNN (Sept. 6, 2022), https://www.cnn.com/2022/09/06/health/juul-settlement-marketing/index.html <https://perma.cc/8JQE-AUZM>. See, e.g., Order Granting Motion for Preliminary Approval of Class Action Settlement, In re JUUL Labs, MDL No. 19-2913 (N.D. Cal. Jan. 30, 2023) [Dkt. No. 3779]; Class Settlement Agreement, In re JUUL Labs, MDL No. 19-2913 (N.D. Cal. Dec. 19, 2022) [Dkt. No. 3722-2] at 3 ¶ 1.13; Proposed Consent Order and Judgment, People v. JUUL Labs, Inc., Index No. 452168/2019 (N.Y. Sup. Ct. Apr. 12, 2023) [Dkt. No. 376], https://ag.ny.gov/sites/default/files/settlements-agreements/NY%20JUUL%20Final.pdf <https://perma.cc/8LWS-B7AE>.

5

The JUUL MDL litigation involves numerous consumer class action and government entity plaintiffs that allege that JLI, Philip Morris, Altria, and others (collectively, "JUUL defendants") violated RICO by "devis[ing] and knowingly carr[ying] out material schemes and/or artifices to defraud the public and deceive regulators" regarding JUUL's nicotine content and addictive potential, its purported creation and design as a "smoking cessation device," and its "role in the youth vaping epidemic." Second Amended Class Action Complaint ("SACAC"), In re JUUL Labs, MDL No. 19-2913 (N.D. Cal. Nov. 20, 2020) [Dkt. No. 1135] ¶ 955; see In re JUUL Labs, 533 F. Supp. 3d 858, 863-64, 875 (N.D. Cal. 2021) (denying Altria's motion to dismiss the RICO claims).

The JUUL MDL plaintiffs further assert that Altria and Philip Morris, among other defendants, directly participated in the following three fraudulent schemes: (1) the "Nicotine Content Misrepresentation Scheme," whereby the JUUL defendants caused JUUL products "to be distributed to consumers with false and misleading information regarding [the products'] nicotine content" and potential addictiveness; (2) the "Flavor Preservation Scheme," whereby the JUUL defendants "defraud[ed] the public and deceive[d] regulators to prevent regulation that would have impeded their plan to keep selling to children," ensuring that certain flavors that appealed to youth remained on the market; and (3) the "Cover-up Scheme," whereby the JUUL defendants adopted a campaign to mislead the public and consumers "by portraying JUUL as a smoking cessation device and denying that the company ever marketed to youth." In re JUUL Labs, 533 F. Supp. 3d at 863 (quoting SACAC ¶¶ 913-950). Defendants have produced more than 875,000 documents in the JUUL MDL, see Declaration of Kimberly D. Harlowe [Dkt. No. 6450-1] ¶ 9, but have not posted any of those documents to Philip Morris's Internet Document Website. See Intervenors' Br. at 6. On January 30, 2023, Judge Orrick preliminarily

6

approved a class settlement in which JLI agreed to pay $255 million to resolve the class's claims. See Order Granting Motion for Preliminary Approval of Class Action Settlement, In re JUUL Labs, MDL No. 19-2913 (N.D. Cal. Jan. 30, 2023) [Dkt. No. 3779]; Class Settlement Agreement, In re JUUL Labs, MDL No. 19-2913 (N.D. Cal. Dec. 19, 2022) [Dkt. No. 3722-2] at 3 ¶ 1.13.

### C. Intervenors' Motion

On August 19, 2021, Intervenors filed a motion asking this Court to clarify whether defendants were obligated under Order #1015 to publish the JUUL MDL discovery materials on Philip Morris's Internet Document Website and, if not, to amend Order #1015 to require defendants to do so. See Mot. at 4 ¶ 4; id. at 5 ¶ 12. Intervenors further request that the Court require Philip Morris to continue maintaining its document website to give the defendants time "to add all of the discovery materials from the JUUL MDL Litigation to [the] document website and, once they are all added, retain them there for no fewer than 12 months, to give the public adequate time to review the newly-posted materials." Id. at 5 ¶ 13. Although the defendants' obligation to maintain the document website was set to expire on September 1, 2021, the Court – upon the Intervenors' request and with no opposition from the defendants – ordered the defendants to maintain the website while the Intervenors' Motion to Clarify remained pending. See Order #112 – Remand.

At the Court's request, the parties have filed supplemental briefing addressing two recent events: (1) the U.S. Food and Drug Administration's ("FDA") issuance of marketing denial orders to JUUL Labs for all its products currently marketed in the United States; and (2) JUUL Labs' settlement with numerous states regarding the marketing of its products to minors. See Minute Order (June 23, 2022); Minute Order (Sept. 8, 2022); U.S. Food & Drug

Admin., *FDA Denies Authorization to Market JUUL Products* (June 23, 2022),

https://www.fda.gov/news-events/press-announcements/fda-denies-authorization-market-juul-

products <https://perma.cc/388W-HUZF>; see also id. (noting that on June 24, 2022, the D.C.

Circuit entered a temporary administrative stay of the marketing denial order, and on July 5,

2022, the FDA administratively stayed its marketing denial order). The supplemental filings

indicated that both Intervenors and defendants agree that the FDA action and the state

settlements have no bearing on the issues raised by Intervenors' motion for clarification. See

Intervenors' Suppl. at 2; Def. Suppl. at 1; Joint Stip. at 1-2. See also supra at n.4. Intervenors'

motion is now ripe for decision.

## II. DISCUSSION

### *A. Motion to Clarify*

#### 1. Legal Standard

There is no Federal Rule of Civil Procedure that specifically governs motions for

clarification. See United States v. All Assets Held at Bank Julius, Baer & Company, Ltd., 315 F.

Supp. 3d 90, 99 (D.D.C. 2018). The case law establishes, however, that the "general purpose of

a motion for clarification is to explain or clarify something ambiguous or vague, not to alter or

amend." United States v. Philip Morris USA, Inc., 793 F. Supp. 2d 164, 168 (D.D.C. 2011)

(internal quotation omitted). Although a motion for clarification may not open the door to "re-

litigat[ing] a matter that the court has considered and decided," Sai v. Transp. Sec. Admin., Civil

Action No. 14-0403, 2015 WL 13889866, at *3 (D.D.C. Aug. 19, 2015), courts in this circuit

have encouraged parties to request clarification when they are uncertain about the scope of a

ruling or its application "in a concrete context or particular factual situation." United States v.

Philip Morris USA Inc., 793 F. Supp. 2d at 168-69; see, e.g., United States v. Volvo Powertrain

8

Corp., 758 F.3d 330, 344 (D.C. Cir. 2014); Barnes v. District of Columbia, 289 F.R.D. 1, 12-13 (D.D.C. 2012).

Rule 65(d) of the Federal Rules of Civil Procedure requires every order granting an injunction to "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(B)-(C). To prevent uncertainty and confusion on the part of the enjoined party, an injunction must provide "explicit notice of precisely what conduct is outlawed." United States v. Philip Morris USA Inc., 566 F.3d at 1137 (quoting Schmidt v. Lessard, 414 U.S. 473, 476 (1974)); see also 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2955 (3d ed. 2022) ("The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed."). Moreover, an injunction must be "narrowly tailored to remedy the harm" that it addresses. J.D. v. Azar, 925 F.3d 1291, 1336 (D.C. Cir. 2019) (quoting Gulf Oil Corp. v. Brock, 778 F.2d 834, 842 (D.C. Cir. 1985)); see ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 972 (D.C. Cir. 1990) ("The law requires that courts closely tailor injunctions to the harm that they address."). In keeping with these principles, courts generally "resolve 'omissions or ambiguities in [an injunction]' in favor of the enjoined party." United States ex rel. Yelverton v. Fed. Ins. Co., 831 F.3d 585, 587 (D.C. Cir. 2016) (citing 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2955).

An injunction is "subject to reasonable interpretation" in light of the fair meaning of its text and the harm it was tailored to address. Alley v. U.S. Dep't of Health & Hum. Servs., 590 F.3d 1195, 1206 (11th Cir. 2009) (quoting Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296 (11th Cir. 2002)). See Nat'l Org. for Women v. Operation Rescue, 37 F.3d 646,

9

657 (D.C. Cir. 1994) ("[T]he meaning of these terms is constrained by the context in which they are actually used in the injunction," and the interpretation of an injunction's language should account for "the context of the ongoing unlawful [conduct]"); United States v. Philip Morris USA Inc., 778 F. Supp. 2d 8, 11 (D.D.C. 2011) (interpreting Order #1015 by reading its language "in conjunction with the purpose to be accomplished by the requirements" of the injunction). See also Schering Corp. v. Ill. Antibiotics Co., 62 F.3d 903, 906-08 (7th Cir. 1995); ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d at 972; In re Baldwin-United Corp. 770 F.2d 328, 339-40 (2d Cir. 1985); Alabama Nursing Home Ass'n v. Harris, 617 F.2d 385, 388 (5th Cir. 1980); United States v. Christie Indus., Inc., 465 F.2d 1002, 1009-11 (3d Cir. 1972).

2. The JUUL MDL "Concerns Smoking and Health, Marketing, and Addiction"

Intervenors assert that defendants must publish the documents they produced during discovery in the JUUL MDL on Philip Morris's Internet Document Website and ask the Court to clarify that Order #1015 has always required defendants to do so. See Intervenors' Br. at 6. The Intervenors maintain that the JUUL MDL is a court action "concerning smoking and health, marketing, addiction, low-tar or low-nicotine cigarettes, or less hazardous cigarette research," Order #1015 ¶ III.C.10.a, because the MDL involves claims against defendants that closely parallel the claims against defendants in this case, whose conduct was found to be unlawful under RICO. See Intervenors' Br. at 4; see also United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 852; In re JUUL Labs, 533 F. Supp. 3d at 861 (denying motion to dismiss RICO claims in JUUL MDL where alleged schemes "had the goal[] of growing the market of nicotine-addicts"). According to Intervenors, Order #1015 must be interpreted so as to effectuate the remedial purpose of that order by "allow[ing] the public to monitor what Defendants are doing internally and to assess the accuracy of future information they may make

available about their activities and their products." Intervenors' Br. at 2 (quoting United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 928-29).

Defendants counter that the JUUL MDL is not a court action "concerning smoking and health, marketing, addiction, low-tar or low-nicotine cigarettes, or less hazardous cigarette research" because the JUUL MDL does not concern conventional cigarettes. See Def. Opp. at 2, 8-10 (quoting United States v. Philip Morris USA Inc., 566 F.3d 1095, 1106 (D.C. Cir. 2009) (per curiam)). Rather, defendants argue that the JUUL MDL concerns e-cigarettes or e-vapor products that did not even exist in 2006 when Judge Kessler issued the remedial order. See Def. Opp. at 8. In defendants' view, Order #1015 must be narrowly construed in light of the particular type of product – conventional, combustible cigarettes – that was at issue in this case; it should not be interpreted to apply to new technologies that were not directly contemplated by the parties or by Judge Kessler when she issued the remedial order. See id. at 9. Defendants maintain that they have never been required under Order #1015 to publish the JUUL MDL discovery materials on Philip Morris's Internet Document Website and that the Court would need to amend Order #1015 to require them to do so. Def. Opp. at 2. Defendants further assert that "[t]he Public Health Intervenors themselves have acknowledged the limits of Order #1015," specifically with regard to its application to JUUL products. Id. Defendants point to the fact that Intervenors agreed that certain requirements of the corrective statement remedy "do not extend to 'smokeless tobacco, e-cigarettes, and other tobacco derived nicotine products.'" Id. (quoting Order #81 – Remand [Dkt. No. 6260]). Defendants conclude that "[t]hese and other actions by the Public Health Intervenors belie any notion that Order #1015 sweeps as broadly as they now claim." Def. Opp. at 2.

11

a. The Internet Document Website Requirement is Not Limited to Conventional Cigarettes

The Court concludes that the obligations under Order #1015 regarding the Internet Document Websites are not limited solely to actions involving conventional cigarettes. It agrees with Intervenors that the JUUL MDL is a court action "concerning smoking and health, marketing, addiction, low-tar or low-nicotine cigarettes, or less hazardous cigarette research" for which defendants must upload their discovery materials to Philip Morris's Internet Document Website. Order #1015 ¶ III.C.10.a. The document website provision's capacious language – i.e., "smoking and health, marketing, addiction" – is broad, and the breadth of this provision directly reflects the breadth of the RICO violations Judge Kessler found. Order #1015 ¶ IIIC.10.a. See United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 852 (finding, among other things, that defendants "lied, misrepresented, and deceived the American public . . . about the devastating health effects of smoking and environmental tobacco smoke, they suppressed research, . . . manipulated the use of nicotine so as to increase and perpetuate addiction, . . . [and] distorted the truth about low tar and light cigarettes so as to discourage smokers from quitting"). And the D.C. Circuit affirmed the breadth of Order #1015: "These injunctions may be broad, but breadth is warranted 'to prevent further violations where[,] [as here,] a proclivity for unlawful conduct has been shown." United States v. Philip Morris USA Inc., 566 F.3d at 1137-38 (alteration in original) (quoting SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1317 (D.C. Cir. 1978)); see generally 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2955 (a "court simply may determine that the only way to prevent a statutory violation and thereby accomplish the purpose of the legislation is by entering a broad decree").

Thus, although defendants' misconduct arose within the context of their manufacture, marketing, and sale of conventional cigarettes, it was defendants' conduct – rather

12

than any specific product – that went to the heart of Order #1015's remedies, including the document disclosure obligations. See United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 928 ("Defendants' suppression and concealment of information has been integral to the [RICO] Enterprise's overarching scheme to defraud. Not only have Defendants failed to publicly disclose all the information they internally held about their cigarettes, but they have also created false controversies about the existence of such information."). Order #1015's document disclosure obligations – including the obligation to maintain an Internet Document Website – were written broadly "to allow the public to monitor what Defendants [we]re doing internally and to assess the accuracy of future information they may make available about their activities and their products," so as to "act as a powerful restraint on [their] future fraudulent conduct." Id. at 928-29. Judge Kessler's injunction was designed to allow the Court, the government, and the public to monitor defendants' future conduct with respect to old and new products. See id. at 909 ("[A]s long as Defendants are in the business of selling and marketing tobacco products, they will have countless 'opportunities' and temptations to take similar unlawful actions in order to maximize their revenues, just as they have done for the past five decades.").

The Court is unpersuaded by the argument that defendants' document disclosure obligations do not extend to the JUUL MDL because Intervenors agreed that certain requirements of the corrective statements remedy do not extend to e-cigarettes. This argument conflates two entirely separate parts of the remedial order – Section III.C of Order #1015, concerning "Document Disclosure in Depositories and on Websites," and Section III.B, concerning "Corrective Statements." In the context of the document disclosure obligations, the JUUL MDL is a court action "concerning smoking and health, marketing, [or] addiction" as contemplated by Order #1015. Extending these obligations to the JUUL MDL documents is

13

consistent with the text and purpose of Judge Kessler's remedial order. See United States v. Philip Morris USA Inc., 778 F. Supp. 2d 8, 11 (D.D.C. 2011) (interpreting Order #1015 by reading its language "in conjunction with the purpose to be accomplished" by the injunction).

### b. Parallels Between This Case and the JUUL MDL

Moreover, the Court has identified three striking similarities between the allegations in this lawsuit and the allegations in the litigation before Judge Orrick. First, the JUUL MDL plaintiffs allege that Philip Morris and Altria have helped to direct the "nicotine content misrepresentation scheme," causing "thousands, if not millions, of JUUL pod packages to be distributed to consumers with false and misleading information regarding [their] nicotine content." In re JUUL Labs, 533 F. Supp. 3d at 866 (quoting SACAC ¶ 913). This allegation overlaps substantially with Judge Kessler's findings that defendants "publicly, vehemently, and repeatedly denied the addictiveness of smoking and nicotine's central role in smoking" and "designed their cigarettes to precisely control nicotine delivery levels and provide doses of nicotine sufficient to create and sustain addiction." United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 307, 309; see also id. at 852 (concluding that defendants "maintain[ed] that neither smoking nor nicotine [wa]s addictive" despite knowing such a statement was false and "manipulat[ed] the design of cigarettes and the delivery of nicotine to smokers" while denying that they were doing so).

Second, the JUUL MDL plaintiffs allege that the JUUL defendants, through the "flavor preservation scheme," worked to "prevent regulation that would have impeded their plan to keep selling to children" and "to ensure that the FDA allowed JUUL's mint flavor to remain on the market." In re JUUL Labs, 533 F. Supp. 3d at 863 (quoting SACAC ¶¶ 922-29); see id. at 870-874 (discussing allegations of coordinated "youth-targeted marketing"); see also

14

SACAC ¶ 948 (alleging that defendants "knowingly and intentionally marketed [JUUL devices] to youth users"). This closely parallels defendants' RICO violations in this case, namely, that they falsely denied that they marketed to youth "while engaging in such marketing and advertising with the intent of addicting young people and enticing them to become lifelong smokers." United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 852; see also id. at 691 (finding that defendants marketed to young people, knowing that they "were highly susceptible to marketing and advertising appeals, would underestimate the health risks and effects of smoking, [and] would overestimate their ability to stop smoking").

And third, the JUUL MDL plaintiffs allege that Philip Morris and Altria participated in a "cover up scheme" in which they adopted a marketing campaign "to mislead consumers into thinking that [JUUL devices] were benign smoking cessation devices, even though [they were] never designed to break addictions." In re JUUL Labs, 533 F. Supp. 3d at 866 (quoting SACAC ¶ 5); see id. at 870-74 (discussing allegations that JUUL MDL defendants obscured JUUL products' addictiveness and health risks); see also SACAC ¶¶ 943, 949 (alleging that Altria "transmitted false and misleading communications to the public and the federal government, including Congress and the FDA, in an attempt to stave off regulation of the JUUL product"). In this case, Judge Kessler found that defendants engaged in "deceptive marketing and cigarette design modifications [that] exploit[ed] smokers' desire for less hazardous and 'low tar' cigarettes which Defendants knew to be no safer than full-flavor cigarettes." United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 852-53; see also id. at 560 (finding that defendants "extensively – and successfully – marketed and promoted their low tar/light cigarettes as less harmful alternatives to full-flavor cigarettes").

Despite these clear parallels, defendants argue that interpreting Order #1015 to apply to the JUUL MDL – a court action that does not involve conventional cigarettes – would have "no logical stopping point" and might require defendants to produce discovery materials from matters involving non-tobacco products, such as wine. Def. Opp. at 10. Such a "slippery slope" argument is not persuasive. In resolving Intervenors' motion for clarification, the Court need not opine on the exact contours of Order #1015. Rather, the Court has concluded simply that the JUUL MDL is a court action concerning "smoking and health, marketing, [and] addiction" within the plain text of Order #1015. Defendants must upload their discovery materials produced in the JUUL MDL to Philip Morris's Internet Document Website. See Order #1015 ¶ III.C.10.a.

## B. *Motion to Modify*

A court "possess[es] the jurisdiction and power to modify [an] original injunction so as to effectuate its intended purpose and result." 1250 24th St. Assocs. Ltd. P'ship v. Brown, 684 F. Supp. 326, 328 (D.D.C. 1988); see United States v. W. Elec. Co., 46 F.3d 1198, 1202 (D.C. Cir. 1995) ("The power of a court of equity to modify a decree of injunctive relief . . . is long-established, broad, and flexible." (quoting N.Y. State Ass'n for Retarded Child., Inc. v. Carey, 706 F.2d 956, 967 (2d Cir. 1983))); see also 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2961.[5] "[T]he standard for determining whether modification is

---

[5] Both parties suggest that Rule 60(b)(5) of the Federal Rules of Civil Procedure provides the legal standard for resolution of the issue of modification. That rule provides: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" if, among other things, "applying [the injunction] prospectively is no longer equitable." FED. R. CIV. P. 60(b)(5) (emphasis added). Under that rule, "[t]he party seeking modification 'bears the burden of establishing that a significant change in circumstances warrants [the injunction's] revision.'" Gov't of Province of Manitoba v. Zinke, 849 F.3d 1111, 1117 (D.C. Cir. 2017) (quoting Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 383 (1992)).

16

appropriate is whether the purposes of the litigation as incorporated into the injunctive decree have been fully achieved." 1250 24th St. Assocs. Ltd. P'ship v. Brown, 684 F. Supp. at 328; see United States v. United Shoe Machinery Corp., 391 U.S. 244, 252 (1968). The "essential inquiry . . . is whether modification is necessary in order to fulfill the original purpose of [the Court's] injunctive order." 1250 24th St. Assocs. Ltd. P'ship v. Brown, 684 F. Supp. at 329.

Intervenors ask the Court to require that defendants maintain the Internet Document Website for at least twelve additional months after uploading the JUUL MDL discovery materials onto the website so that the public may have sufficient time to review the materials. See Mot. at 5 ¶ 13; Intervenors' Br. at 8. Defendants' obligation to maintain the Internet Document Website was set to expire on September 1, 2021 and has so far been extended only until this Court rules on the Intervenors' Motion to Clarify. See Order #1015 ¶ III.C.8; Order #1021; Order #112 – Remand. To give effect to the Court's conclusion that JUUL MDL documents must be made available on defendants' document website, the Court concludes that it must modify Order #1015 to require the defendants to maintain the Internet Document Website past its original expiration date. This extension is necessary to fulfill the "original purpose" of Order #1015. See 1250 24th St. Assocs. Ltd. P'ship v. Brown, 684 F. Supp. at 329. If the Internet Document Website expiration date were not extended, the public would not be able to access and review the JUUL MDL discovery materials to which they are entitled under Order #1015, and the Court's clarification of Order #1015 would be futile. The extension will apply only to the JUUL MDL discovery materials. See Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S.

---

The Court concludes that Rule 60(b)(5) is inapplicable here because Intervenors do not seek relief from an injunction but rather seek to extend the injunction's application. See United States v. W. Elec. Co., 46 F.3d at 1202 (noting that requests to relieve an enjoined party of an injunction's constraints comes within Rule 60(b)(5) whereas requests to "tighten the decree in order to accomplish its intended result" fall within the court's equitable discretion).

17

at 391 (modification of an injunction should be "suitably tailored to the changed circumstance" justifying modification); Mot. at 6 ¶ 17. Defendants therefore will be required to maintain Philip Morris's Internet Document Website with respect to the JUUL MDL discovery materials for a period of twelve months following the date that all such documents are published on the website.

## III. CONCLUSION

More than a decade after Judge Kessler found the defendants liable under RICO for "engaging in a lengthy, unlawful conspiracy to deceive the American public about . . . the addictiveness of nicotine," United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 26, Philip Morris and Altria once again found themselves defending against allegations that they participated in a scheme to "defraud consumers" and "grow[] the market of nicotine-addicts" through misleading marketing. In re JUUL Labs, Inc., 533 F. Supp. 3d at 861. Intervenors ask the Court to clarify that the defendants are required to publish documents relating to the JUUL MDL litigation on the Internet Document Website pursuant to Judge Kessler's remedial order, Order #1015. The Court concludes that the JUUL MDL "concern[s] smoking and health, marketing, [and] addiction," and documents produced in that litigation therefore must be made available to the public on the Internet Document Website. Order #1015 ¶ III.C.10.a. A separate Order consistent with this Opinion shall issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 6\19\23

18